UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| HAROLD E. SEXTON, JR., | : | Case No. 1:14-cv-535 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore not entitled to supplemental security income ("SSI") and disability insurance benefits ("DIB"). (*See* Administrative Transcript ("Tr.") (Tr. 10-22) (ALJ's decision)).

**I.**

Plaintiff filed applications for DIB and SSI on October 15, 2009, alleging disability beginning on October 8, 2009. (Tr. 275-84, 298). Plaintiff claims that he is unable to work due to arthritis, anxiety, paranoia, and sub-average intellectual functioning. (Tr. 15). This claim was denied initially (Tr. 107-08, 139-45) and upon reconsideration (Tr. 109-10, 146-51). The ALJ held an administrative hearing by video conference on May 18, 2011, at which Plaintiff was informed of and waived his right to counsel. (Tr. 67-106). On October 4, 2011, the ALJ issued a decision, denying benefits.

(Tr. 114-30). Plaintiff requested review, and on December 19, 2011 the Appeals Council issued an order vacating the ALJ's decision and remanding the case to an ALJ for further administrative proceedings. (Tr. 136-38).

Plaintiff's case was remanded to an ALJ who held an administrative hearing by video conference on October 31, 2012, at which Plaintiff was represented by counsel and at which a witness and a vocational expert testified. (Tr. 30-58). On December 14, 2012, the ALJ issued a decision, denying benefits. (Tr. 10-22). The Appeals Council denied Plaintiff's request for review on May 10, 2014 (Tr. 1-4), rendering the ALJ's decision the final decision of the Commissioner. 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff now seeks judicial review pursuant to section 205(g) of the Act. 42 U.S.C. § 405(g), 1383(c)(3).

Plaintiff is 57 years old. (Tr. 33). He completed high school in special education classes and took vocational classes in carpentry. (Tr. 74). Plaintiff's past relevant work experience[1] was as a housekeeper.[2] (Tr. 36).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

    1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

---

[1] Past relevant work experience is defined as work that the claimant has "done within the last 15 years, [that] lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 416.965(a).

[2] Plaintiff last worked in 2007. (Tr. 36). He worked 30 hours a week. (Tr. 75). Plaintiff has never worked full time. (*Id.*)

2

2. The claimant has not engaged in substantial gainful activity since October 8, 2009, the alleged onset date or October 15, 2009, the application date (20 CFR 404.1571 *et seq.*, 20 CFR 404.1571 *et seq.*, 20 CFR 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative joint disease, chronic obstructive pulmonary disease, obesity, borderline intellectual functioning/learning disorder, depression, anxiety, and personality disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: he can never climb ladders, ropes, or scaffolds. He can never crawl. He can occasionally climb ramps and stairs, kneel, and crouch, he can frequently balance and stoop. He must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. He must be able to use a hearing aid. Mentally, the claimant is limited to simple, routine work with oral and hands on instruction, in a setting with regular expectations, he is limited to occasional interactions with others and few changes. He cannot work around minors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May 12, 1967 and was 42 years old, which is defined as a younger individual age 18-40, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

    10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

    11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 8, 2009, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-22).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to SSI or DIB. (Tr. 22).

On appeal, Plaintiff argues that the ALJ erred by failing to consider whether his conditions met Listing 12.05.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

4

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

### A.

The record reflects that:[3]

Plaintiff claims that he is unable to stand or sit for long periods due to knee pain. (Tr. 15). He estimated that he could sit for 15 minutes before walking to "pop" his knee back in place. (*Id.*) He maintains that he has difficulty walking more than 3 to 15 minutes due to COPD, and that he is sensitive to dusts and chemicals. (*Id.*) Plaintiff also testified that he wears a hearing aid in his right ear and has to read lips. (*Id.*)

Plaintiff claims that he does not perform household chores and occasionally prepares simple meals. (Tr. 16). His son and his son's girlfriend assist with household

---

[3] Neither side recounted the relevant facts. Accordingly, the Court incorporates the facts as recounted by the ALJ.

5

chores. (*Id.*) Plaintiff sees his cousin on a daily basis and shops with her. (*Id.*) His cousin also reminds him to take his medication, helps with paying bills, and keeps Plaintiff's appointment book. (*Id.*)

Plaintiff has a history of knee pain. (Tr. 16). Views of his left knee dated February 11, 2010 showed degenerative changes, including narrowing involving the medial compartment with periarticular hypertrophic spurring. (*Id.*) Despite these findings, Plaintiff often reported improvement in his symptoms of pain and limitations. (*Id.*) On March 18, 2010, he reported attending physical therapy with "great improvement," and by May 13, 2010, he acknowledged that his symptoms had improved with physical therapy and regular exercise. (*Id.*) Plaintiff's knee pain was described as "well controlled." (*Id.*)

Consultative psychological evaluations document GAF scores ranging from 48 to 61.[4] (Tr. 17). In a consultative psychological evaluation dated October 1, 2008, Plaintiff was estimated to be of borderline intellectual functioning and displayed decreased memory, concentration, and fund of knowledge. (Tr. 18). However, Plaintiff's GAF score was 53. By January 23, 2009, Plaintiff's "mood seemed appropriate" and he reported "doing okay." (*Id.*) Similar findings were noted again on January 26, 2009,

---

[4] The Global Assessment of Functioning ("GAF") is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. A score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. A score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

6

February 12, 2009, and June 16, 2009.  (*Id*.)  On June 25, 2009, Plaintiff denied any mental problems.  (*Id*.)  On June 10, 2010, Plaintiff denied problems, his affect and conversation were appropriate, and no symptoms were voiced or observed.  (*Id*.)  Treatment notes dated March 18, 2010, describe Plaintiff as having only a "mild" intellectual disability.  By October 3, 2012, Plaintiff reported being in a good mood and on October 5, 2012, it was noted that Plaintiff is "becoming better everyday and had inner peace within himself."  (*Id*.)

Treatment notes indicate improvement in mental functioning with medication.  (Tr. 18).  On December 23, 2009, Plaintiff admitted that Prozac helped his symptoms, but that he was "still having some depression."  (*Id*.)  By February 3, 2010, it was noted that Prozac was "beneficial" for Plaintiff.  (*Id*.)  Treatment notes dated October 25, 2012 note that Plaintiff presented to the session without sweating and "believes the medication prescribed to him is helping him a lot."  (*Id*.)

The record also documents a history of noncompliance.  On March 5, 2009, Plaintiff reported that he was not taking his medication as prescribed.  (Tr. 18).  On November 5, 2009, Plaintiff reported that he "has not had his medications for 3 months," which was not helping with his coping skills.  (*Id*.)  On March 1, 2010, Plaintiff reported being out of medication and stated that he did not have an appointment until the middle of the month.  (*Id*.)  He also stated that he had not been taking his sleep medication because he found it ineffective.  (*Id*.)  The record also documents non-compliance with psychiatric appointments.  (Tr. 18).  In January and February 2009, Plaintiff reported that

7

he was unable to attend appointments due to lack of gas money and weather conditions. (*Id.*) Subsequent treatment notes dated November 2, 2009 note that several attempts were made to contact Plaintiff, with no response. (*Id.*) Similarly, on January 5, 2010, it was noted that Plaintiff "did not keep in touch with me this month." (*Id.*)

The record further indicates that Plaintiff reported being unable to seek employment due to weather conditions and lack of gas money and not due to any physical or mental limitations. (Tr. 19). He also reported that he was unsure whether he wanted to work, not that he was unable to do so. (*Id.*) In fact, he referred to himself as "lazy" and a "couch potato." (*Id.*)

**B.**

Plaintiff maintains that the ALJ failed to properly evaluate Listing 12.05.

For a Plaintiff to show that his impairment meets a Listing, the impairment must meet all of the specified criteria of that Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). Moreover, it is Plaintiff who bears the burden of proof at this step of the sequential evaluation process. *See, e.g., Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (the burden of proof is on the claimant at the first four steps of the sequential evaluation process).

Listing 12.05 requires a claimant to show "significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, App. 1 at § 12.05. Subparagraph C of this

listing requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" *Id.* at § 12.05C. To meeting Listing 12.05(C), an individual's impairment must satisfy both the diagnostic description of mental retardation in the introductory paragraph and the requirements set forth in subparagraph C. *Id.* at § 12.00A. *See, e.g., Daniels v. Comm'r of Soc. Sec.*, 70 Fed. App'x 868, 872 (6th Cir. 2003) ("The ALJ acknowledged Plaintiff's WAIS-R performance I.Q. of 67, but he determined that she nevertheless was not mentally retarded, pointing out Dr. Berg's observation that she clinically appeared to function at a level exceeding her test score.").[5] A low IQ score is only one component of mental retardation.[6] Plaintiff must also establish adaptive deficits. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a).[7]

Therefore, a claimant must make three showings to satisfy Listing 12.05C: (1) he experiences "significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period" (*i.e.*, the diagnostic description); (2) he has a "valid verbal, performance, or full scale IQ of 60

---

[5] *See also Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) ("Yet, it is not enough for a claimant to point to one IQ score below 71; the claimant must also satisfy the 'diagnostic description' of mental retardation in Listing 12.05. It is undisputed that no psychologist has diagnosed Cooper with mental retardation. The examiner and clinical psychologist who tested him diagnosed him instead as borderline intellectual functioning.").

[6] *McDonald v. Sec'y of H.H.S.*, No. 85-3322, 1986 U.S. App. LEXIS 22988, at *5 (6th Cir. Feb. 25, 1986) ("[T]he Secretary properly considered claimant's academic success, occupational success, independent living, and ability to care for herself as evidence that the 77 IQ test result was not representative of claimant's intelligence.").

[7] Adaptive functioning involves how effectively an individual copes with common life demands and meets standards of personal independence in areas such as communication, self-care, and social skills. DSM-IV TR at 40.

through 70"; and (3) he suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 697 (6th Cir. 2007).

The Commissioner concedes that with regard to the final criteria for Listing 12.05C, plaintiff had both physical and mental impairments imposing significant work-related limitations of function. However, Plaintiff did not meet the first required element. Notably, Plaintiff rests his argument entirely on the results of one isolated IQ test conducted on May 7, 2008. (Doc. 10 at 3). Plaintiff points out that on that date, a Wechsler Adult Intelligence Scale ("WAIS") III IQ test revealed a verbal IQ of 64, a performance IQ of 78, and a full scale IQ of 67. (Tr. 477). Based on this set of scores alone, and the fact that he had additional "severe" impairments, Plaintiff argues that he meets the criteria for Listing 12.05C.

However, Plaintiff has not shown that he has significantly sub-average general intellectual functioning, resulting in deficits in adaptive functioning, as required to meet the capsule definition for Listing 12.05. *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (it is not enough for a claimant to point to one IQ score below 71; the claimant must also satisfy the "diagnostic description" of mental retardation in Listing 12.05). Here, the ALJ discussed substantial evidence supporting his finding that Plaintiff had "borderline" intellectual functioning, a higher level of general intellectual functioning than that required to meet the capsule definition for Listing 12.05 based on

intellectual disability, and moreover, lacked the deficits in adaptive functioning required to meet such definition.

For example, the ALJ noted that on October 1, 2008, psychiatrist Dr. Donna Hobbs assessed Plaintiff's intellectual functioning only as "perhaps borderline." (Tr. 18, 19, 438). On October 9, 2009, psychologist Dr. Thomas Heiskell, after testing Plaintiff's cognitive functioning, concluded that his ability to understand and follow instructions was not significantly impaired. (Tr. 19, 490-91). Plaintiff's ability to maintain attention and to perform simple, repetitive tasks was also not impaired. (Tr. 19, 491). Additionally, the ALJ observed that on March 18, 2010, Dr. Christopher Aviles, Plaintiff's primary care physician, assessed Plaintiff as having only a "mild intellectual disability." (Tr. 18, 598).

The ALJ also properly considered the assessment of Dr. Steven J. Meyer, a psychologist, who reviewed the record and did not believe Plaintiff met the criteria for Listing 12.05. (Tr. 19, 547). Rather, based on his detailed review of the record evidence, Dr. Meyer concluded that Plaintiff was capable of simple and moderately complex routine work, with oral and hands-on instruction, in a setting with regular expectations, and only occasional intermittent interactions with others and few changes. (Tr. 19, 545). The ALJ incorporated this assessment directly into his mental RFC finding. (Tr. 15). Additionally, the ALJ noted that Dr. Steiger, another psychologist who reviewed the record, affirmed Dr. Meyer's assessments in connection with Plaintiff's request for reconsideration. (Tr. 19, 636).

11

The ALJ also properly relied on the conclusions of Dr. Albert Virgil, who conducted the adult IQ test. Even after documenting Plaintiff's scores, Dr. Virgil did not believe that Plaintiff had significantly sub-average intellectual functioning, nor deficits in adaptive functioning, as required to meet the capsule definition for Listing 12.05. (Tr. 19-20, 478). After performing the IQ test, Dr. Virgil stated that Plaintiff was "functioning within the mild level of mental retardation, according to the WAIS III results." (Tr. 477). However, Dr. Virgil further explains that other than the IQ scores, the DSM-IV criteria for "adaptive behavior deficits" were not met, and Plaintiff's actual functioning was estimated to be within the "borderline" level. (Tr. 19, 477).

Even after taking the IQ scores into account, Dr. Virgil concluded that Plaintiff was able to understand, remember, and follow instructions and he estimated that Plaintiff's ability to do so in a work setting would be only moderately impaired. (Tr. 19, 478). Dr. Virgil opined further that Plaintiff was capable of completing simple, routine activities of daily living and other tasks, both at home and in the community. (Tr. 19, 478). Finally, Dr. Virgil opined that Plaintiff's mental ability to maintain the attention, concentration, persistence, and pace needed to perform routine tasks was only mildly impaired. (Tr. 19, 478). Therefore, the ALJ correctly concluded that Dr. Virgil had ultimately diagnosed "borderline intellectual functioning," insufficient to meet the "capsule definition" requirements of Listing 12.05. (Tr. 19). *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003) (WAIS performance IQ score of 67 alone was

not determinative, where psychologist observed that, clinically, claimant appeared to function at a level exceeding her test score).

Plaintiff also argues that the fact that the ALJ did not mention Plaintiff's adult IQ scores in his decision shows the ALJ selectively discussed evidence. However, even if Plaintiff's adult IQ scores were representative of his functioning, it is not clear whether such adult IQ scores could even be probative in demonstrating an onset of a cognitive impairment before the age of 22. Plaintiff points to a number of cases for the proposition that adult IQ scores combined with other circumstantial evidence (such as school records and work history) can establish onset for mental retardation before the age of 22. *See, e.g., Pedro v. Astrue*, 849 F.Supp.2d 1006, 1011-13 (D. Or. Mar. 23, 2011). However, even in *Pedro*, the Court highlighted that the record contained no evidence of any intervening cause that might have adversely impacted Pedro's IQ after she reached the age of 22, such as drug use. 849 F.Supp.2d at 1012, n.2. Accordingly, the relevance of Plaintiff's adult IQ scores to the requirements of Listing 12.05 is questionable.

Moreover, the record contains a contradictory set of higher IQ scores. An IQ test conducted when Plaintiff was 13 years old revealed that he had a verbal IQ of 72, a performance IQ of 90, and a full scale IQ of 79+7. (Tr. 536). All of these scores are above the range of 60 to 70 needed to meet the criteria for Listing 12.05C. Moreover, these higher childhood IQ scores are more contemporaneous to Plaintiff's functioning

during the developmental period of Listing 12.05's capsule definition and more consistent with the record as a whole.[8]

Accordingly, substantial evidence supports the ALJ's finding that Plaintiff's true intellectual functioning was at the "borderline" level. Accordingly, the ALJ properly found that Plaintiff's impairments did not meet Listing 12.05, because Plaintiff failed to evidence both adaptive deficits prior to age 22 and the "diagnostic description" of mental retardation in Listing 12.05.

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Harold E. Sexton, Jr. was not entitled to supplemental security income or disability insurance benefits, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED.**

---

[8] Records from Pike County and Waverly City School Systems include a psychological evaluation conducted on October 29, 1980, when Plaintiff was 13 years old and in seventh grade. Ron Howitz, the school psychologist who conducted the evaluation noted that Plaintiff was referred for the evaluation "because of academic difficulties and peer relations." (PageID 573). In the report, Mr. Howitz noted that Plaintiff was severely hearing impaired and exhibited "questionable auditory discrimination," i.e., misunderstanding words like "thief" for "piece" and "alphabet" for "acrobat." (*Id.*) Mr. Howitz also noted that Plaintiff's speech was "generally intelligible," but that there were "multiple articulation, syntaxic and grammatic [sic] errors" and that his "speech content was immature." (*Id.*) Mr. Howitz also discussed Plaintiff's reported difficulty establishing peer relationships and opined that his "immature verbalizations and attitudes manifested during the session…have negatively influenced classmates already, setting [Plaintiff] up as the recipient of ridicule and avoidance." (*Id.*) Mr. Howitz recommended placement in special education due to Plaintiff's "wide-ranging academic deficits and socialization problems." (PageID 575). Plaintiff did attend special education classes throughout the rest of his schooling and completed twelfth grade. These facts, together with the IQ scores, simply fail to establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning."

The Clerk shall enter judgment accordingly, whereupon, as no further matters remain pending for the Court's review, this case is **CLOSED** in this Court.

Date:  5/8/2015                                          *s/ Timothy S. Black*
                                                        Timothy S. Black
                                                        United States District Judge